IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JACQUELINE MAZZUCCA          :
                             :          CIVIL ACTION
            v.               :
                             :          NO. 11-0468
UNITED STATES OF AMERICA     :

**SURRICK, J.**                                    **AUGUST 17, 2012**

## MEMORANDUM

This is an action in which Plaintiff Jacqueline Mazzucca seeks damages as a result of a

fall on the rear sidewalk of the Southwark Post Office in Philadelphia on January 27, 2009.  On

January 24, 2011, Plaintiff filed a Complaint against Defendant the United States of America,

alleging that on January 27, 2009,  "a defective and dangerous condition in and/or of the

sidewalk" of the United States Post Office caused Plaintiff to "trip and fall to the ground"

("January 27 Fall") and to suffer physical and economic injuries as a result.  (Compl. ¶¶ 9, 12,

15-18, ECF No. 1.)  Plaintiff alleges that Defendant's "carelessness, recklessness and

negligence" caused this accident and her resulting injuries.  Plaintiff asserts a claim under the

Federal Tort Claims Act, 28 U.S.C. § 1346(b) ("FTCA")[1] seeking damages for medical expenses

---

[1] Section 1346(b)(1) of the FTCA states that:

> the district courts . . . shall have exclusive jurisdiction of civil actions on claims
> against the United States, for money damages, accruing on and after January 1, 1945,
> for injury or loss of property, or personal injury or death caused by the negligent or
> wrongful act or omission of any employee of the Government while acting within the
> scope of his office or employment, under circumstances where the United States, if
> a private person, would be liable to the claimant in accordance with the law of the
> place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

in the amount of $8,502.80 and for non-economic damages including past and future pain and suffering and loss of ability to enjoy life's pleasures.  (Compl. ¶¶ 15-18.)  On May 31, 2011, Defendant filed an Answer.  (Answer, ECF No. 5.)  A trial by judge sitting without a jury was held on February 13, 2012.[2]  On April 13, 2012, the parties each submitted proposed findings of fact and conclusions of law.  (ECF Nos. 18, 19.)[3]  Based upon the evidence and testimony presented at trial, we make the following Findings of Fact and Conclusions of Law, pursuant to Federal Rule of Civil Procedure 52(a).

## I.     FINDINGS OF FACT[4]

1.     Plaintiff is a female adult individual currently residing at 1216 Fitzgerald Street, Philadelphia, Pennsylvania.  (Tr. 26, 98.)

2.     At the time of the January 27 Fall, Plaintiff was residing with her sister, at 825

---

[2] At the non-jury trial, three witnesses testified.  These witnesses were:  Plaintiff (Trial Tr., Feb. 13, 2012 ("Tr.") 25, ECF No. 21 (on file with Court)); Barbara Santoro, a woman who has known Plaintiff "from when she was a child, maybe about nine years old," who is a distant family relative, who sees Plaintiff "once every couple of months," and who saw Plaintiff on the day of the Accident (*id*. at 14, 19); and Girard Carrozza, a United States Post Office employee for over twenty years, Manager at a United States Post Office since 1999, and Manager of the Southwark Post Office since late 2009 (*id*. at 131-33).  The transcript of one of Plaintiff's treating physicians, Dr. Yarus, was submitted by agreement.  (*Id*. at 175; Yarus Dep., submitted on Mar. 1, 2012 (on file with Court).)

[3] On April 18, 2012, Defendant filed a motion for leave to file an opposition to two of Plaintiff's proposed findings of fact and conclusions of law.  The opposition was attached to the motion.  (ECF No. 22.)  Plaintiff opposed this motion.  (ECF No. 23.)  On April 23, 2012, we ordered that the submissions be made part of the record and that no further submissions would be accepted.  (ECF No. 24.)

[4] These Findings of Fact reflect credibility determinations regarding the testimony and evidence presented.  Credibility determinations are within the sole province of the Court, as the finder of fact.  Fed. R. Civ. P. 52(a); *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982).

Dickinson Street, Philadelphia, Pennsylvania ("825 Dickinson Street").  (*Id.* at 27, 38, 98.)

3.     Defendant, through the United States Postal Service, owns and operates the United States Post Office located at 925 Dickinson Street, Philadelphia, Pennsylvania ("Southwark Post Office").  (*Id.* at 37.)

4.     825 Dickinson Street is approximately one block away from the Southwark Post Office.  (*Id.* at 98.)  The front of the Southwark Post Office is located on Dickinson Street, between 9th and 10th Streets.  (*Id.* at 22, 42.)  The rear of the Southwark Post Office is located on Wilder Street, between 9th and 10th Streets. (*Id.* at 15, 22, 42.)

5.     There is no public entrance to the Southwark Post Office from Wilder Street.  (*Id.* at 42.)  There is a door in the rear of the Southwark Post Office, which is for employees only.  Customers are not permitted to use it.  (*Id.* at 147.)

6.     There is a sidewalk behind the Southwark Post Office, on the Southwark Post Office side of Wilder Street.  This is where the January 27 Fall is alleged to have occurred ("Sidewalk").  (*Id.* at 41-43.)

7.     The rear of the Southwark Post Office is located across the street from a CVS Pharmacy ("CVS").  (*Id.* at 17, 42, 43, 148.)  There is a gate separating the sidewalk from the parking lot of CVS.  (*Id.* at 43-44.)  There is an opening in the gate through which "anybody can walk" ("Gate Opening").  (*Id.* at 44, 148; *see also id.* at 152 & Ex. Def.-5 at USPS 00153.)

8.     Plaintiff had gone to that CVS many times.  (*Id.* at 101.)  She almost always went

the same way, on Wilder Street, and would walk through the Gate Opening to enter the store.  (*Id.* at 101-04.)

9.      The Southwark Post Office employs "mounted routes," which are routes where the mail carriers drive vehicles to conduct their business.  (*Id.* at 146.)  The Southwark Post Office uses five mail carrier vehicles.  These vehicles are vans. (*Id.*)  The mail carriers generally begin their day at 6:30 a.m. and are generally back, with their vehicles parked at the rear of the Southwark Post Office building, by 3:15 or 3:30 p.m.  (*Id.*)  The mail carriers' vehicles are typically parked on the Sidewalk.  (*Id.*)  When the five vehicles are all parked on the Sidewalk at the same time, they cover the entire Sidewalk (behind the post office).  (*Id.*)

10.     Prior to the January 27 Fall, Plaintiff had suffered injuries as a result of several other incidents.  (*Id.* at 28.)

11.     When Plaintiff was nineteen years old, she was involved in a motorcycle accident. (*Id.*)  As a result of this accident, she suffered cuts and bruises to her face, a fractured right pelvis, cuts to and numbness in her left forearm, and a fractured left pinky.  (*Id.* at 29-32.)  Plaintiff claims that she has recovered from most of these injuries.  (*Id.*)  However, Plaintiff has continued to experience numbness in her left forearm.  (*Id.* at 31.)  The numbness, she claims, has never extended into her left hand or left wrist.  (*Id.*)

12.     In May or June 2008, Plaintiff suffered a slip and fall outside of a 7-Eleven store. (*Id.* at 32-33, 119.)  Plaintiff slipped and fell because of a large crack in the

4

pavement. (*Id.* at 119.)[5]  As a result of this fall, Plaintiff injured the heel of her

left foot and her left knee. (Tr. 33, 120.)  Plaintiff received treatment for these

injuries in the form of therapy from Dr. Sedacca, who also treated Plaintiff for her

injuries as a result of the January 27 Fall.  Plaintiff sued 7-Eleven for the injuries

received in the 7-Eleven fall. (*Id.* at 120-21.)  Plaintiff's left knee injury was not

completely healed at the time of the January 27 Fall.  Her left knee has continued

to bother her up until the time of trial. (*Id.* at 34.)  Plaintiff has been diagnosed as

having arthritis in her knees. (*Id.*)

13.　　　A few days after the May or June 2008 slip-and-fall at the 7-Eleven, Plaintiff

suffered another injury. (*Id.* at 34-35.)  Plaintiff was using an ATM machine.  As

she attempted to retrieve dispensed money from the ATM machine, the machine

door closed on her left hand. (*Id.* at 34.)  As a result of this incident, Plaintiff

sustained a bruise to her left ring finger. (*Id.* at 35.)  Plaintiff and Dr. Yarus both

indicated that this bruise was completely healed at the time of the January 27 Fall.

(*Id.*; *see also* Yarus Dep. 70-71.)

14.　　　On January 27, 2009, there was between 0.7 inches and 0.9 inches of snowfall on

the ground in Philadelphia, Pennsylvania.[6]  Plaintiff contends that snow did not

---

[5] In her deposition, Plaintiff testified that while walking near the 7-Eleven, there was a three-inch hole in the ground and that her ankle got caught in the hole, causing her to fall.  (*See* Tr. 119-20 (citing Mazzucca Dep.).)

[6] Plaintiff testified during her September 23, 2011 deposition that there had been snow on the ground on January 27, 2009.  (Tr. 50-51 (citing Mazzucca Dep.).)  Plaintiff subsequently testified during the deposition that "maybe there was no snow" that day. (*Id.* at 51 (citing Mazzucca Dep.).)

During the February 13, 2012 trial, Plaintiff testified that on January 27, 2009, there was

contribute to her fall. (Tr. 51-52.)

15.     At 12:00 p.m.[7] on January 27, 2009, Plaintiff left 825 Dickinson Street to walk to CVS, located on Wilder Street. (Tr. 38-42, 52.) The rear of the Southwark Post Office is located across the street from CVS. (*Id.* at 17, 42, 43, 148.) Plaintiff went to CVS frequently. She sometimes went to CVS twice a day, and sometimes more often than that. (Tr. 101, 114.) She almost always went the same way, on Wilder Street, and would walk through the Gate Opening to enter CVS. (*Id.* at 101-04.)

16.     On January 27, 2009, on her way to CVS, Plaintiff saw her sister outside Iovan's Tax Agency ("Iovans"), which is located at 1435 South 9th Street, Philadelphia, Pennsylvania. (*Id.* at 15, 39.) Iovans is a half a block away from CVS, located on the same side of Wilder Street. (*Id.* at 41.) As Plaintiff was proceeding to CVS, Barbara Santoro came to the door of Iovans and asked where Plaintiff was going.

---

snow on the ground. (*Id.* at 48-51.) At trial, Plaintiff explained that she changed her position during the deposition because "[Defendant's counsel] had [Plaintiff] believe that it did not snow the whole month of January" and Plaintiff believed Defendant's counsel in light of her position as an attorney. (*Id.* at 51-52.)

   Also at trial, both parties introduced evidence of the local climatological data for the day of January 27, 2009. Defendant's figures, derived from the United States Department of Commerce data, showed that on January 27, 2009, there was 0.7 inches of snowfall in Philadelphia. (Ex. Def.-13.) Plaintiff's figures, also derived from the United States Department of Commerce data, showed that on January 27, 2009, there was 0.9 inches of snowfall in Philadelphia. (Ex. Pl.-3.)

   [7] At her deposition, Plaintiff testified that she tripped and fell around noon. (Tr. 52.) Later in the deposition, Plaintiff testified that she fell at 5:00 p.m. (*Id.*)

   At trial, Plaintiff testified that she tripped and fell around noon. (*Id.*) Plaintiff explained that she had changed her testimony during the deposition because Defendant's counsel led her to believe that the fall occurred around 5:00 p.m. (*Id.* at 52-53.)

Plaintiff responded "CVS." (*Id.* at 15, 24, 40.)  Since the Southwark Post Office

was on the way to CVS, Santoro handed Plaintiff a letter and asked Plaintiff to

mail it.  Plaintiff agreed to do so.  (*Id.* at 24, 40.)

17.     Plaintiff left Iovans and headed toward the rear of the Southwark Post Office on

Wilder Street.  Since mail carriers would often as a courtesy take letters directly

from individuals for mailing, Plaintiff was hoping to spot a mailman to whom she

could hand the letter.  (*Id.* at 42-43, 163.)

18.     Either on the way to deliver the letter or immediately after delivering the letter,[8]

Plaintiff tripped and fell on a sidewalk.  (*Id.* at 44-46, 73 & Ex. Carrozza-1 (color

photograph showing area where Plaintiff tripped and fell)[9].)  From the standpoint

of someone walking from Iovans to CVS, the area of the Sidewalk where Plaintiff

indicates that she tripped and fell is past the Gate Opening for the CVS.  (Tr. 44;

*see also id.* at 153-55 & Ex. Def.-5 at USPS000159, USPS00160, USPS00175.)[10]

19.     Plaintiff asserts that while walking, the top of her left foot became lodged in an

uncovered pipe or hole in the Sidewalk.  (Tr. 45, 56; *see also id.* at 48-49 & Exs.

---

[8] Plaintiff forgets exactly when she tripped and fell, in relation to delivery of the letter. (Tr. 44.)

[9] Plaintiff testified that Exhibit Carrozza-1 does not reflect the appearance of the area where Plaintiff tripped and fell on January 27, 2009.  Exhibit Carrozza-1 shows a hole having a cover on it.  Plaintiff testified that the hole did not have a cover on it on January 27, 2009.  In addition, Plaintiff testified that there was a crack in the pavement of the Sidewalk on January 27, 2009.  (Tr. 46-47.)  The crack is depicted in Exhibit Carrozza-2.  (*Id.* at 47-48 & Ex. Carrozza-2.)

[10] At trial, Plaintiff initially testified that she did not know why she ended up walking past the Gate Opening.  (Tr. 105-06.)  She subsequently testified that she walked past the Gate Opening in order to mail the letter that was given to her by Santoro.  (*Id.* at 109.)

Carrozza-3 & Carrozza-4 (color photographs depicting hole over which Plaintiff

allegedly tripped and fell); *id.* at 149-50 & Ex. Def.-4.)  Plaintiff did not see this

hole.  (Tr. 115.)  The hole caused her to trip and fall.  (*Id.* at 56-57.)  As she was

falling, Plaintiff's body went forward, but then she fell backward on her rear end.

(*Id.* at 109.)  Plaintiff's left knee and left hand struck the ground.  (*Id.* at 57, 110.)

Plaintiff asserts that the hole in the Sidewalk was round and approximately five

inches wide.  (*Id.* at 45.)  The hole was created by a missing utility grate cover.

(*Id.* at 73, 114.)

20.     At about the time of Plaintiff's fall, Santoro saw an individual on the ground, on

the sidewalk adjacent to the Southwark Post Office.  (*Id.* at 16-17.)  The

individual was on the ground for approximately three minutes.  (*See id.* at 16-17,

110.)  After the individual got up and turned, Santoro recognized that the

individual was Plaintiff.  (*Id.* at 16, 20.)[11]  After getting up, Plaintiff walked

toward Iovans.  (Tr. 17, 58.)  Santoro observed that Plaintiff was having difficulty

walking.  (*Id.* at 17.)

Plaintiff entered Iovans and saw her sister and Santoro.  (*Id.* at 111.)[12]  Plaintiff

told Santoro that she "fell in a hole."  (Tr. 17.)  Plaintiff testified that Santoro and

her sister made jokes to try to make Plaintiff feel better.  (*Id.* at 111.)  Santoro

---

[11] Santoro testified that she could see Plaintiff's face from where she was located inside
Iovans.  (Tr. 16-17, 19.)  Santoro did not witness Plaintiff's actual tripping or falling.  (*Id.* at 16,
20.)

[12] Santoro testified that when Plaintiff returned to Iovans after the fall, Plaintiff's sister
was no longer at the agency.  (Tr. 21.)

testified that she wiped Plaintiff's hand with paper towels because it had been cut, and Plaintiff's knee, which had been bruised. (*Id.* at 17-18, 51.) Neither Santoro nor Plaintiff's sister called for medical attention for Plaintiff. (*Id.* at 21, 112.) Santoro did not go to the Southwark Post Office to report that Plaintiff had been injured because of a defect on the Post Office's property. (*Id.* at 23-24.)

21.      Plaintiff subsequently left Iovans and went home. (*Id.* at 17-18, 59, 112.) She was able to walk. (*Id.* at 22.) Plaintiff did not go to the Southwark Post Office to report that she had been injured on the Post Office property. (*Id.* at 115.)

22.      A couple of weeks, or a month, after the Accident, Plaintiff took photographs of the area where she tripped and fell. Some of the photographs showed snow on the ground. Plaintiff claimed that the hole that caused the fall was still there at that time. (Tr. 48-49, 83-84, 89-97.) Plaintiff does not contend that snow contributed to her tripping or falling. (*Id.* at 49-50.)[13] At the time that Plaintiff took these photographs, she did not walk into the post office or report the hole in the Sidewalk to anyone at the Southwark Post Office. (Tr. 115.)

23.      In December 2009, Plaintiff was in the hallway of a doctor's office when a

---

[13]  Defendant's Interrogatory Number Nine stated: "Identify with specificity everything that constituted the carelessness, recklessness and negligence of the Postal Services as alleged in Paragraph 13 of the Complaint." (Tr. 85.) Plaintiff's answer to Interrogatory Number Nine stated: "The Postal Service failed to maintain the sidewalk in a reasonably safe condition for pedestrians lawfully traversing the sidewalk. More specifically, the Postal Service failed to keep the sidewalk free of ice. Additionally, the Postal Service failed to repair the hole shown in the photographs provided into which Plaintiff's foot fell and/or warn pedestrians such as Plaintiff of the dangerous conditions the ice and hole presented." (*Id.* at 85-86.) The Interrogatory Answer does not appear to have been verified. (*Id.* at 88.) Federal Rule of Civil Procedure 33 states that "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(3).

window fell and injured Plaintiff's neck.  (*Id.* at 36, 122-23.)  Plaintiff was inside

the building ("Rota Building") with a friend, who was receiving physical therapy

from Dr. Sedacca.  (*Id.* at 123.)  Plaintiff was standing in the hallway outside of

Dr. Sedacca's office when a window fell "out of the track."  (*Id.*)  As the window

fell, Plaintiff raised her left arm and protected her head with her left hand.  The

window struck her in the neck and she fell to the ground.  (*Id.*)  As a result of this

incident, Plaintiff sustained injuries to her neck and upper back.  (*Id.* at 36-37,

123.)  Plaintiff saw Dr. Yarus for these injuries, and for pain in her left hand.  (*Id.*

at 123-24; Yarus Dep. 74-75.)  Plaintiff sued the owner or manager of the Rota

Building for these injuries.  (Tr. 123.)

24.     Plaintiff claims that she suffered injuries to her left hand as a result of the January

27 Fall.  (*Id.* at 110.)  Plaintiff alleges that for at least two months before the

January 27 Fall, she was completely symptom-free with respect to her left hand

and left wrist.  (Tr. 36.)  Plaintiff is not claiming that the January 27 Fall resulted

in injuries to her pelvis, knee, neck or back.  (*Id.* at 30, 34, 37.)  Plaintiff sought

medical treatment for her injuries that she claims to have sustained as a result of

the January 27 Fall.

25.     On January 27, 2009, at 4:33 p.m. (Yarus Dep. 59 & Ex. Def.-4), which Plaintiff

claims was approximately two hours after the January 27 Fall had occurred,

Plaintiff sought medical treatment at the emergency room of Jefferson University

Hospital, Methodist Hospital Division ("Methodist Hospital"), in Philadelphia,

Pennsylvania (Tr. 59).[14]  Plaintiff states that she did not arrive at the emergency

room in an ambulance.  (Tr. 113.)[15]

26.     At the emergency room, Plaintiff was examined, and her hand and foot were

wrapped.  (Tr. 59.)  An x-ray was taken of Plaintiff's left hand and wrist.  (Yarus

Dep. 16.)  The x-ray revealed an avulsion fracture of the base of Plaintiff's fifth

metacarpal on her left hand.  (*Id.* at 16-17.)[16]  Plaintiff was released from

Methodist Hospital that same day.  (Tr. 60; *see also* Yarus Dep. 18 (testifying

based on review of x-ray report ordered during Plaintiff's January 27, 2009

emergency room visit).)

27.     Approximately two days after the January 27 Fall, Plaintiff saw Dr. Joseph

Cavuto, who had been her primary care physician for approximately eight years.

(Tr. 60.)  Dr. Cavuto examined Plaintiff.  Plaintiff described the January 27 Fall to

---

[14] At her deposition, Plaintiff testified that she waited approximately two days to seek emergency room care for injuries sustained in the January 27 Fall.  (Tr. 59-60; *see also* Yarus Dep. 56-59 (testifying that Plaintiff told him on her first visit to him that she had gone to the emergency room two days after her fall).)  At trial, Plaintiff explained that her deposition testimony was a mistake and that she went to the emergency room approximately two hours after the Fall.  (Tr. 59-60, 112-13.)

[15] The emergency room admission record states that Plaintiff arrived in the emergency room by ambulance at 4:33 p.m. on January 27, 2009.  (Yarus Dep. 59 & Ex. Def.-4.)

[16] Dr. Yarus defined "metacarpal" as being "at the level of [the] knuckles."  (Yarus Dep. 17.)  "[I]f you go back from there to right before the wrist bends, that would comprise the metacarpals in areas of the index, long, ring and little fingers and in the thumb."  (*Id.*)  "[B]ehind the knuckle there is, also, a metacarpal and that goes down to where the thumb moves at the base of the wrists."  (*Id.*)  Dr. Yarus described the "fifth metacarpal" as "if you take the little finger and you go from the knuckle backwards, that will be the actual bone down to where the wrist moves and that would be the entire bone itself."  (*Id.* at 17-18.)

An "avulsion fracture" refers to "a piece of bone that came from the main body of the metacarpal."  (*Id.* at 18.)

Dr. Cavuto, who recommended that she see an orthopedic doctor named Dr.

David Bozentka.  (*Id.* at 61.)

28.    Following Dr. Cavuto's recommendation, Plaintiff sought the care of Dr.

Bozentka, a hand surgeon at Presbyterian Hospital, for numbness and tingling in

her left hand and thumb, painful thumb-locking in her left hand and pain in her

left wrist.  (*Id.* at 61-63; *see also* Yarus Dep. 18-19 (recalling specific review of

records from Plaintiff's visit to Dr. Cavuto in February 2009).)[17]  Plaintiff was

examined by and received treatment from Dr. Bozentka "a couple of times" from

February 4, 2009 to October 13, 2010.  (*See* Yarus Dep. 19-25 (reviewing

Plaintiff's records from visits to Dr. Bozentka); Tr. 64.)

29.    After Plaintiff's initial visit, Dr. Bozentka indicated that if Plaintiff's pain were to

persist, he would order an MRI.  (Yarus Dep. 21.)  On February 14 or 17, 2009, an

MRI was performed on  Plaintiff's left wrist.  (*Id.* at 21-22.)  The MRI revealed

that Plaintiff had "nondisplaced transverse and oblique fractures of the base of the

fourth and fifth metacarpals respectfully with soft tissue edema and edema in the

base and proximal shaft of the fourth metacarpal and throughout the base and

shaft of the fifth metacarpal."  (*Id.* at 22.)[18]  At one point, Dr. Bozentka gave

Plaintiff a soft cast, which prevented Plaintiff from bending her hand or wrist.

---

[17] Plaintiff testified that she had never experienced the thumb-locking in her left hand or the numbness and tingling in the outer part of her left hand and thumb, prior to the January 27 Fall.  (Tr. 63-64.)

[18] Dr. Yarus explained that whereas the prior emergency room x-ray revealed a fracture of only the fifth metacarpal, the MRI revealed fractures of the fourth and fifth metacarpals since an MRI is "more sensitive" than an x-ray.  (Yarus Dep. 22.)

Plaintiff wore this cast until she lost it, after which she wore an Ace bandage which helped.  (Tr. 64-65.)  On Plaintiff's last visit to Dr. Bozentka on October 13, 2010, Dr. Bozentka conducted a physical examination of Plaintiff.  Plaintiff was still having "persistent paresthesia, which is an indication of numbness and tingling that mimics carpal tunnel and she also had triggering of the thumb and discomfort over the volar metacarpophalangeal area." (Yarus Dep. 24.)[19]  Dr. Bozentka observed that there were positive findings for triggering and carpal tunnel.  He observed that there was no locking.  (Yarus Dep. 23-24.)

Plaintiff stopped seeing Dr. Bozentka after he recommended that Plaintiff have surgery.  She stopped seeing Dr. Bozentka because this recommendation scared her.  (Tr. 66.)

30.   Dr. Yarus is a licensed and board-certified[20] subspecialist in orthopedic surgery and pain management.  (Yarus Dep. 6-7.)  Dr. Yarus practices with Regional Orthopedic Associates, P.C., which has several offices, including one in Philadelphia.  (*Id.* at 7-8.)  He sees patients with orthopedic diseases and orthopedic injuries and patients who have pain management issues.  (*Id.*)  These

---

[19] "Triggering" is the "snapping of the tendon as it rides underneath the small piece of tissue [called the] retinaculum . . . . If there is swelling of the tendon, then the glide isn't there and that's where the triggering comes from.  It's actually a snapping that occurs." (Yarus Dep. 25.)

[20] Dr. Yarus testified that he has a certificate in orthopedic surgery, which is through the American Board of Orthopedic Surgeons.  (Yarus Dep. 6-7, 9.)  Dr. Yarus' resume does not state that he is certified by the American Board of Orthopedic Surgeons.  (*Id.* at 10.)  It states that he is certified by the American Association of Physician Specialists, which is a "blanket" organization that covers incorporated boards.  (*Id.* at 9-10.)

include patients who have been involved in accidents, such as slip-and-falls. (*Id.* at 8.) He has experience in dealing with problems in a patient's extremities, including their hands and feet. (*Id.*) Dr. Yarus has an interventional pain practice in which he injects his patients and treats them for management of their medications. (*Id.*) As part of his practice in making diagnoses, he typically considers diagnostics tests, such as x-rays, MRIs and CAT scans. (*Id.* at 9.) He is not a hand specialist. (*Id.* at 12.) Dr. Yarus is qualified as an expert in the field of orthopedics. (*Id.* at 8-9, 13.)

31.  After Dr. Bozentka recommended that Plaintiff undergo surgery, Plaintiff began seeing Dr. Yarus. (Yarus Dep. 25-26.) Plaintiff was referred to Dr. Yarus by her attorneys. (Tr. 66.) This was not the first time that Plaintiff's law firm had referred a client to Dr. Yarus. (Yarus Dep. 41-42.) Dr. Yarus examined and treated Plaintiff from November 2010 to May 2011. All examinations and treatments were made in his Philadelphia office. (Yarus Dep. 13; Tr. 124.)

32.  Plaintiff first met with Dr. Yarus on November 11, 2010. (Yarus Dep. 13, 42.) It was Dr. Yarus' understanding that Plaintiff was seeing him for pain in her left hand and left wrist, which Plaintiff told him resulted from a fall on the sidewalk on January 27, 2009 "due to an elevation in the pavement." (Yarus Dep. 14, 42-43, 54.)[21] Dr. Yarus reviewed Plaintiff's medical history. (Yarus Dep. 13-14.)

---

[21] Dr. Yarus testified that he had no first hand knowledge of how Plaintiff hurt her hand during the January 27 Fall. (Yarus Dep. 43.) His knowledge of how Plaintiff injured her hand was based on information he received from Plaintiff and a review of records provided by Plaintiff. (*Id.* at 43-44.) During each of Plaintiff's visits to Dr. Yarus, she stated that she hurt her left hand when she tripped on a curb and fell on a concrete sidewalk. (*Id.* at 44-46.) During the

Through his review, he learned that on January 27, 2009, she went to an emergency room for pain in her left hand and left wrist, as well as in her left knee. (*Id.* at 14-16.) X-rays were ordered on her left hand and left wrist. (*Id.* at 16.) Dr. Yarus reviewed the x-ray report. (*Id.* at 16.) The report showed that she had an avulsion fracture of the base of her fifth metacarpal in her left hand. (*Id.* at 17-18.) It was Dr. Yarus' understanding that Plaintiff left the emergency room on the same day of her fall. (*Id.* at 18.) It was also Dr. Yarus' understanding that Plaintiff subsequently began treatment with Dr. Cavuto, whom she saw once on February 2, 2009 for pain in her left wrist, and her family physician, Dr. Bozentka, whom she initially saw on February 4, 2009 for pain in her left wrist. (*Id.* at 18-21.) Dr. Yarus reviewed MRI reports of Plaintiff's left wrist. (*Id.* at 62.) The February 2009 MRI report indicated that she had fractured the base of the bone on the back of her hand and a contusion. (*Id.* at 63-64.) The second MRI report dated February 2011 showed that Plaintiff's left wrist was "entirely normal." (*Id.* at 68.) The contusion was gone. (*Id.* at 69-70.)[22] Dr. Yarus also reviewed records from Dr. Sedacca. (*See id.* at 29, 59.)

33. On Plaintiff's initial November 11, 2010 visit, Dr. Yarus conducted a physical

---

initial visit to Dr. Yarus, Plaintiff did not disclose that she had been involved in the motorcycle accident when she was nineteen years old. (*Id.* at 60, 66-67.) Dr. Yarus' notes do not indicate any motorcycle accident and resulting injuries to her left arm. (*Id.* at 61.) Nor do the notes indicate that she had previously broken her pinky finger on her left hand. (*Id.*)

[22] Dr. Yarus noted in his deposition that the MRI tests "are morphologic interpretations and cannot speak to the issue of cause and effect and cannot speak to the issue of impressions and diagnoses. That's not what they are utilized for . . . ." (Yarus Dep. 73.)

examination.  (*Id.* at 26.)  He observed that Plaintiff's complaints about finger-triggering,[23] tenderness in her wrist and hand, and fractures at the base of her ring and pinky fingers — all in her left hand — pointed to signs of decor veins and carpal tunnel.  (Yarus Dep. 28-29.)  Dr. Yarus prescribed the pain medicine Percocet for Plaintiff.  (*Id.* at 30.)[24]  He ordered EMG testing on Plaintiff, which she tried to complete four times, but all four times, she could not complete the test due to pain she experienced from it.  (Yarus Dep. 30-31.)  Dr. Yarus' initial diagnosis of Plaintiff was that she had a contusion on her left hand and left wrist and a sprain to her dorsal wrist.  (*Id.* at 32.)  He diagnosed her as having issues with attachments to her bones, which affected the function of her left hand and wrist.  (*Id.*)  Dr. Yarus did not note fractures as an issue in his initial diagnosis.  (*Id.* at 33.)  It was Dr. Yarus' understanding that one month prior to the January 27 Fall, Plaintiff had not been experiencing any symptoms in her left wrist or left hand.  (*Id.* at 29.)  Based on a review of Plaintiff's medical records and his physical examination of Plaintiff, Dr. Yarus opined that Plaintiff's injuries were caused by Plaintiff's fall on January 27, 2009.  (*Id.* at 33.)  Plaintiff typically saw Dr. Yarus once a month.  (Tr. 66; Yarus Dep. 34.)  She saw him a total of six times.  (Yarus Dep. 48, 54; Tr. 124.)  Dr. Yarus conducted extensive physical

---

[23] Dr. Yarus opined that Plaintiff's thumb-triggering was caused not by the fracture of her left fourth and fifth metacarpals, but rather by "the contusion that occurred to the hand and wrist when [Plaintiff] fell."  (Yarus Dep. 25.)

[24] Plaintiff stated that the pain medication helped alleviate the symptoms in her left hand, but it was "a temporary fix."  (Tr. 68-69.)

examinations of Plaintiff for each of these six visits.  (Yarus Dep. 49, 53-54.)  He checked her vital signs, height and weight.  He conducted cursory exams, cardiac, respiratory, GI and GU, mood and affect, speech, superficial neurologic, and superficial emphatic and psychologic tests.  (*Id.* at 49-50.)  He examined her skin for its conditions and to determine whether it contained ulcers, rashes or abnormal moles.  (*Id.* at 50-51.)  He checked her head and neck, veins and thyroid.  (*Id.* at 51.)  He conducted an eye examination.  (*Id.*)  He examined her ear and nose. (*Id.*)  He conducted a cardiac exam.  (*Id.* at 52.)  He examined her abdomen and listened to her bowel sounds.  (*Id.* at 52-53.)  He examined her extremities.  (*Id.* at 53.)[25]

34.    On Plaintiff's last visit to Dr. Yarus, he performed a physical examination. (Yarus Dep. 34.)  His conclusions from that exam were "pretty much the same" as the initial examination.  (*Id.* at 35.)  Dr. Yarus' final diagnosis was that Plaintiff "had A1 pulley locking for the thumb," "signs of carpal tunnel," "some suggestion of a left radial nerve problem, although not completely satisfactory because she couldn't complete the EMG," "findings of decor veins, which is the tendonitis to the thumb," and problems with her ligaments and smaller attachments.  (*Id.* at 35-36.)  Her fractures had healed.  (*Id.* at 36.)  Dr. Yarus believed that these symptoms were the result of the January 27 Fall.  (*Id.*)  He described Plaintiff's prognosis as "poor."  (*Id.* at 37.)  Dr. Yarus opined that the A1 pulley trigger is

---

[25] On January 20, 2011, Dr. Yarus saw Plaintiff for pain to her right wrist which Plaintiff claimed was a result of the January 27 Fall.  (Yarus Dep. 54-55.)

permanent, as are the effects of the decor veins.  (*Id.* at 38.)[26]  Dr. Yarus believed

that while surgery for Plaintiff was an option, there was no 100 percent guarantee

that surgery would completely fix Plaintiff's problems.  (Tr. 37-39.)  Dr. Yarus

noted in his records that he would refer Plaintiff to a hand specialist since he no

longer performed surgeries.  (*Id.* at 12; *see also* Tr. 124-25.)[27]

35.     On May 19, 2011, Dr. Sedacca conducted an exam of Plaintiff.[28]  Plaintiff saw Dr.

Sedacca for one month to receive therapy for the injuries allegedly sustained from

the January 27 Fall.  (Tr. 71.)

36.     Plaintiff testified that she still experiences the following symptoms in her left

hand:  numbness and tingling, thumb-locking and pain in her wrist.  (*Id.* at 69-70.)

Plaintiff testified that the thumb-locking is getting worse.  (*Id.* at 70.)  She claims

that the tingling and numbness in her left hand has stayed the same since she had

first began treatment for these symptoms.  (*Id.*)[29]

37.     Plaintiff is right-handed.  (Tr. 115.)  She testified that the injuries she sustained as

---

[26] Plaintiff testified that her treating physicians told her that the injuries were "something [she has] to live with and there's nothing more they can do for [her]."  (Tr. 71-72.)

[27] Dr. Yarus also treated Plaintiff in connection with her December 2009 accident involving the falling window at the Rota Building, which occurred eleven months after the January 27 Fall.  With respect to this window-falling incident, Plaintiff saw Dr. Yarus in December 2009.  (Yarus Dep. 74.)  Dr. Yarus provided treatment for those injuries; he treated her neck, back and left hand.  (*Id.* at 75.)

[28] Dr. Sedacca also treated Plaintiff for her injuries that resulted from the 7-Eleven slip-and-fall.  (Tr. 33.)

[29] Plaintiff testified that the numbness that she experiences in her forearm was not the result of the January 27 Fall.  (Tr. 118-19.)

a result of the January 27 Fall have impacted her daily activities.  For example, she cannot carry as many bags.  (*Id.* at 72.)  A cup of coffee fell out of her hand. (*Id.*)  She does not cook as often as she used to because she is scared.  (*Id.*)  While Plaintiff does not claim to be disabled or that these problems occur daily, she stated that "it's always in the back of my head that my hand locks and it hurts." (*Id.*; *see also id.* at 116.)  Plaintiff occasionally has had difficulty running.  (*Id.* at 117.)

38.  On February 4, 2010, Plaintiff's counsel, Steven Schatz, Esq. of the law firm Law Offices of Master Weinstein, P.C., sent a letter on behalf of Plaintiff to the United States Postmaster General ("February 4 Letter").  (Compl. Ex. A.)  The letter advised the Postmaster General that Law Offices of Master Weinstein, P.C. represented Plaintiff "with respect to personal injuries which were sustained in a slip and fall which occurred on [] January 27, 2009."  (*Id.*)  The February 4 Letter enclosed "a completed Standard Form 95, entitled "Claim for Damage, Injury, or Death" ("Claim Form"), with supporting documentation, executed by . . . Jacqueline Mazzucca."  (*Id.*; *see also* Tr. 53-56, 75-81.)

39.  The Claim Form states that on Tuesday, January 27, 2009, at 4:00 p.m., Plaintiff "was walking on sidewalk located at 925 Dickenson[sic] Street, Philadelphia, PA 19147-9998 when she tripped and fell over an elevation in the sidewalk causing her to fracture her wrist."  (Tr. 80.)  Plaintiff signed the Claim Form on February 1, 2010.  (*Id.*)  At trial, Plaintiff stated that she signed the Claim Form without reading it.  (*Id.* at 55, 80-81.)  She said that she "sign[s] things because I trust my

lawyer, you know."  (*Id.* at 81.)

40.     On January 24, 2011, Plaintiff filed the Complaint against Defendant.  (Compl.)

Plaintiff claims that she suffered the following economic losses:  (1) $1,670.80

(Pennsylvania Department of Public Welfare); (2) $2,020.00 (Regional

Orthopedic Associates, P.C.); (3) $ 4,376.00 (University Dynamic MRI); (4)

$436.00 (University of Pennsylvania Orthopedic Surgery), for a total of

$8.502.80.  (*Id.*)  Plaintiff is not claiming damages for lost earnings or lost earning

capacity.  (Tr. 127.)  Plaintiff does seek non-economic damages for past and

future pain and suffering and for loss of life's pleasures.

41.     In January 2009, the United States Postal Service had in place written safety

manuals.  (Tr. 134.; *see also* Ex. Pl.-9 (Supervisory Safety Handbook).)  Postal

Service supervisors were provided with other written resources on safety.  (Tr.

134.)  Managers of the Post Office branches were required to follow these written

policies and procedures concerning accident prevention and investigation.  (*Id.* at

135.)  The policies and procedures concerning accident prevention and

investigation at the Southwark Post Office included:  (1) inspections of the

premises at least twice a year;[30] (2) daily searches of the premises by a

Maintenance Custodian for vandalism, broken glass and other safety hazards; and

---

[30] These inspections include "an inspection of the perimeters, inside and outside for
safety; any kind of electrical problem there may be; just safety, the issue of safety, so it's
occupational safety.  Any kind of hazard needs to be reported in this inspection."  (Tr. 136.)  If a
deficiency is identified in an inspection, the deficiency is reported to facilities maintenance.  (*Id.*)
A missing grate cover on an outdoor utility grate would be the kind of deficiency that would be
identified in one of these inspections.  (*Id.*)

(3) written reports on all accidents that occurred on Post Office property.  The

daily searches include conducting a perimeter check of Wilder Street, which

includes the Sidewalk.  (Tr. 135-36, 138.)

42.	The Postal Service first learned of the January 27, 2009 Fall in February 2010,

more than a year later.  (*Id.* at 137.)  The manager at the time, Girard Carrozza,

learned that Plaintiff was claiming that she stepped into a hole created by a

missing grate cover on the Sidewalk.  (*Id.*)  Carrozza investigated this claim.  (*Id.*

at 137-38.)

43.	Carrozza first called James Hamilton, the Manager of the Southwark Post Office

at the time of Plaintiff's January 27 Fall.  (*Id.*)  Hamilton told Carozza that no

such accident was reported or recorded in the Postal Service system.  (*Id.* at 138.)

Carrozza searched the Postal Service's safety reports database.  (*Id.*)  He searched

the records from January 2, 2009 to November 2011 for any work order that

would have been generated for a missing grate cover.  (*Id.* at 141, 167-69.)  There

was nothing in the records.  (*Id.*)  Carrozza did not search the records prior to

January 2009 because he believed that any record of a missing grate cover would

have been uncovered by the Occupational Safety and Health Administration

("OSHA") records.  (*Id.* at 141-43, 167; *see also* Ex. Pl.-11 (OSHA Report, June

2008).)  There was no such record in the OSHA report.  (Tr. 143-44.)  The follow-

up OSHA inspection in January 2009 did not list a missing grate cover as a

deficiency.  (*Id.* at 144.)

44.	Carrozza also spoke with Dennis Terico, the Maintenance Custodian of the

Southwark Post Office at the time of the January 27 Fall.  (*Id.* at 138-39.)  Terico would conduct a daily inspection of the Southwark Post Office's perimeters, both inside and outside, first thing every morning.  He would search for vandalism, broken glass, whether the yard gate was open, or any other kind of safety or occupational hazard.  (*Id.*)  A missing grate cover on a utility grate would fall in this category.  (*Id.* at 138-39, 141.)  These searches included perimeter checks of Dickinson Street, Wilder Street and the Post Office yard.  The searches covered the Sidewalk.  (*Id.* at 138.)  Terico would report any deficiency he saw to a Supervisor or Manager.  (*Id.* at 139-40.)[31]  The Supervisor or Manager would call facility maintenance, at a centralized location.  (Tr. 140.)  All work orders would be generated at this location and assigned to local facilities.  The Manager would receive a copy of the generated work order.  (*Id.*)  There was no report of a missing grate cover as claimed by Plaintiff.  (*Id.* at 138, 144.)  To Carrozza's knowledge, no one conducting a safety inspection or daily inspection ever found a missing utility grate cover on the sidewalk during the period in question.  (*Id.* at 144, 157.)  All utility grates in the Sidewalk had covers when Carrozza worked as a letter carrier beginning in 1994, and when he returned as Manager of Southwark Post Office in October 2009.  (*Id.* at 144-45, 155-56.)

45.     At trial, Carrozza testified that at 4:00 p.m., even if there had been a missing grate cover, the utility grate would not have been exposed because a vehicle would have

---

[31] For example, at the time of the instant trial, there was a missing grate cover across the street from the Southwark Post Office, on Wilder Street, on property not owned by the Post Office.  (Tr. 139, 156-57.)  Terico nevertheless reported that deficiency.  (*Id.*)

been parked over and covering it.  (*Id.* at 147, 150-151 +  Ex. Def. 4 at USPS

00148).  (Tr 147, 150-51 & Ex. Def.-4 at USPS00148.)

46.      Based on his demeanor at trial and our examination of the record and trial

exhibits, we find that Girard Carrozza was a credible witness.

47.      We find that Plaintiff was not a credible witness.  Her demeanor on the witness

stand was not compelling.  Plaintiff's testimony was filled with inconsistencies.

At different times during the litigation, she has given different accounts of how

the Fall occurred.  She admitted that on several occasions, she testified in a

particular way because she wanted to say what she thought an attorney wanted her

to say.  She did not bother to tell the Post Office about the dangerous condition, or

her fall, even when she allegedly went back to the scene several weeks later to

take photographs.  All of this without a plausible explanation.  Her testimony was

simply not believable.

## II.   CONCLUSIONS OF LAW

1.      This is a personal injury action against the United States.  Plaintiff has exhausted

her administrative remedies.  We have subject matter jurisdiction pursuant to the

FTCA.  28 U.S.C. § 1346(b)(1); *see also Imbrenda v. United States*, No. 07-3663,

2008 WL 879857, at *5 (E.D. Pa. Mar. 28, 2008).

2.      Venue in this case is proper pursuant to 28 U.S.C. § 1402(b).  *Imbrenda*, 2008

WL 879857, at *5.

3.      Pennsylvania law governs this lawsuit since the January 27 Fall allegedly occurred

in Philadelphia, Pennsylvania.  *See* 28 U.S.C. § 1346(b)(1); *Mass. Bonding & Ins.*

*Co. v. United States*, 352 U.S. 128, 129 (1956) (holding that negligence claim brought under the FTCA is governed by the substantive law of the state where the accident occurred); *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 179 (3d Cir. 2000); *Imbrenda*, 2008 WL 879857, at *5 ("The court must determine whether the circumstances of the accident were such that the United States, if a private person, would be liable to [Plaintiff] under Pennsylvania law.") (quoting *Seidman v. United States*, No. 95-6955, 1996 WL 421905, at *2 (E.D. Pa. July 24, 1996) (internal quotation marks omitted)).

4.      Initially, Plaintiff requests that we apply Pennsylvania's spoliation doctrine and draw an adverse inference against Defendant.  (ECF No. 18 at 12.)  She argues that Defendant was in possession of records concerning problems or repairs that were found or corrected during its inspections and "could have easily put to rest any argument here by simply doing a search of records for the relevant time-period."  (*Id.*)  She argues "it seems obvious that any prudent person or entity in Defendant's position should not have failed to search records for the four month period immediately prior to Plaintiff's fall."  (*Id.*)  Defendant responds that the spoliation doctrine does not apply here.  (ECF No. 22 at 2.)

5.      "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102, 110 (E.D. Pa. 2005) (quoting *Mosaid Techs., Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004)).  If a party is able to demonstrate that evidence has

24

been subject to spoliation, there are a variety of sanctions that a court in its discretion may impose, such as the dismissal of a claim or claims, the suppression of evidence, an adverse inference, fines or attorneys' fees and costs. *Id.* at 110-11 (citation omitted). However, in exercising its discretion, the court must consider the following factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Id.* (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)). When looking to the first factor, "the court must consider whether [the party that destroyed the evidence] intended to impair the ability of the other side to effectively litigate its case." *Id.* (quoting *In re Wechsler*, 121 F. Supp. 2d 404, 415 (D. Del. 2000); *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995)). With respect to the second factor, "the court should take into account whether [the party that did not destroy the evidence] had a meaningful opportunity to examine the evidence in question before it was destroyed." *Id.* at 112 (citing *Wechsler*, 121 F. Supp. 2d at 416 (quotation omitted)). In deciding on a sanction, the court should choose the "least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *Id.* at 111 (citations omitted). For a spoliation inference to apply, "it must appear that there has been an actual suppression or withholding of the evidence; no unfavorable inference arises when the

25

circumstances indicate that the document or article in question has been lost or accidentally destroyed, or when failure to produce it is otherwise properly accounted for." *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir. 1983).

6. We agree with Defendant that the spoliation doctrine does not apply here. There is no evidence of any actual suppression, destruction or withholding of evidence by Carrozza or any other employee or agent of Defendant. At trial, Carrozza testified that he did not search the records for a missing grate cover for the period of September 2008 to January 2, 2009 because the OSHA inspections and re-inspections would have covered this four-month time period. A missing grate cover would have been revealed in the OSHA reports. It was not. (*See* Ex. Def.-11.) We are satisfied that there is no basis upon which to draw an adverse inference against Defendant.

7. Under Pennsylvania law, a plaintiff must prove the following elements to establish a claim of negligence: "(1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the harm in question; and (4) the plaintiff incurred actual loss or damage." *Krentz v. Consol. Rail Corp.*, 910 A.2d 20, 27 (Pa. 2006).

8. It has long been the law of the Commonwealth of Pennsylvania that the duty of a possessor of land toward a third person entering the land is determined by the status of the entrant at the time of the incident. *Palange v. City of Phila., Law Dep't*, 640 A.2d 1305, 1308 (Pa. Super. Ct. 1994); *Crotty v. Reading Indus., Inc.*, 345 A.2d 259, 262-63 (Pa. Super. Ct. 1975). Pennsylvania has adopted the

Restatement (Second) of Torts to define the entrant's status.  *See, e.g.*, *Tarnoski v. United States*, No. 04-0060, 2007 WL 1387302, at *3-4 (M.D. Pa. May 8, 2007); *Pintkowski v. United States*, No. 02-7812, 2003 WL 22005720, at *3-4 (E.D. Pa. Aug. 18, 2003); *Palange*, 640 A.2d at 1308.

9.     Section 329 of the Restatement defines a "trespasser" as "a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise."  Restatement (Second) of Torts § 329 (1965); *see also Ott v. Unclaimed Freight Co.*, 577 A.2d 894, 896 (Pa. Super. Ct. 1990); *Oswald v. Hausman*, 548 A.2d 594, 598-99 (Pa. Super. Ct. 1988).

10.    Section 330 defines a "licensee" as "a person who is privileged to enter or remain on land only by virtue of the possessor's consent."  Restatement (Second) of Torts § 330 (1965); *see also Cutler v. Peck Lumber Mfg. Co.*, 37 A.2d 739, 740 (Pa. 1944); *Ott*, 577 A.2d at 896; *Keck v. Doughman*, 572 A.2d 724, 728-29 (Pa. Super. Ct. 1990).  Licensees include "[o]ne whose presence upon the land is solely for his own purposes, in which the possessor has no interest, and to whom the privilege of entering is extended as a mere personal favor to the individual, whether by express or tacit consent or as a matter of general or local custom."  Restatement (Second) of Torts § 330 cmt. h (1965).

11.    Section 332 of the Restatement defines an "invitee" as follows:

(1) An invitee is either a public invitee or a business visitor.

(2) A public invitee is a person who is invited to enter or remain on land as

a member of the public for a purpose for which the land is held open to the public.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.

Restatement (Second) of Torts § 332 (1965), cited with approval in *Atkins v. Urban Redevelopment Auth. of Pittsburgh*, 414 A.2d 100, 103 n.2 (Pa. 1980); *see also Pintkowski*, 2003 WL 22005720, at *4 (citing *Palange*, 640 A.2d at 1308).

12.     Neither party contends that Plaintiff was a trespasser at the time of the January 27 Fall.  The parties dispute whether Plaintiff was a licensee or an invitee.  An invitee is distinguished from a licensee by whether she is invited to enter the land or simply permitted to enter the land.[32]

> Although invitation does not in itself establish the status of an invitee, it is essential to it.  An invitation differs from mere permission in that:  an invitation is conduct which justifies others in believing that the possessor *desires* them to enter the land; permission is conduct justifying others in believing that the possessor is *willing* that they shall enter *if they so*

---

[32] The Restatement states:

It is not enough, to hold land open to the public, that the public at large, or any considerable number of persons, are permitted to enter at will upon the land for their own purposes . . . .  There must be some instances of invitation, there must be some inducement or encouragement to enter, some conduct indicating that . . . public entry and use . . . is expected and desired . . . .  When a landowner tacitly permits the boys of the town to play ball on his vacant lot they are licensees only; but if he installs playground equipment and posts a sign saying that the lot is open free to all children, . . . those who enter in response to it are invitees.

Restatement (Second) of Torts § 332 cmt. d (1965).

28

> *desire.*

*Palange*, 640 A.2d at 1308 (emphasis in original).

13.    We conclude that Plaintiff was a business invitee of the Southwark Post
Office.  She was on its premises in order to mail a letter.  *See Tarnoski*,
2007 WL 1387302, at *3 (holding that plaintiff was business invitee of
Post Office because she was on the premises to purchase postage and mail
a package).  Customers of the Southwark Post Office were to enter from
the front of the building, on Dickinson Street.  (Tr. 22, 42.)  It was not
intended for customers to enter the building from the rear, or Wilder
Street.  (*Id.* at 15, 22, 42, 147.)  Nevertheless, the testimony established
that at the rear of the Southwark Post Office, mail carriers would often
take letters directly from individuals for mailing as a courtesy.  (*Id.* at 42-
43, 163.)  This testimony was reasonable and credible.  Plaintiff was going
to the Southwark Post Office to mail a letter for Barbara Santoro.  She was
on the Sidewalk, hoping to approach a mail carrier for the purpose of
mailing the letter.  This is an activity that is directly connected with
business dealings of the Southwark Post Office.  Plaintiff was a business
visitor.

14.    Section 343 of the Restatement (Second) describes the duty landowners
owe to business invitees:

> A possessor of land is subject to liability for physical
> harm caused to his invitees by a condition on the land
> if, but only if, he:  (a) knows or by the exercise of

> reasonable care would discover the condition, and
> should realize that it involves an unreasonable risk of
> harm to such invitees, and (b) should expect that they
> will not discover or realize the danger, or will fail to
> protect themselves against it, and (c) fails to exercise
> reasonable care to protect them against the danger.

*Myers v. Penn Traffic Co.*, 606 A.2d 926, 928 (Pa. Super. Ct. 1992),

*appeal denied*, 620 A.2d 491 (Pa. 1993).

15.     The landowner's duty of protection toward business
         visitors is the highest duty owed to any entrant upon
         land, and the landowner is under an affirmative duty
         to protect the business visitor not only against dangers
         which he knows, but also against those which with
         reasonable care he might discover.   The business
         visitor enters landowner's premises with implied
         assurance of preparation and reasonable care for his
         protection and safety while he is there.

*Treadway v. Ebert Motor Co.*, 436 A.2d 994, 999 (Pa. Super. Ct. 1981).

However, a landowner "is not an insurer of the safety of those on his

premises."  *Moultrey v. Great Atl. & Pac. Tea Co.*, 422 A.2d 593, 595-96

(Pa. Super. Ct. 1980) (citing Restatement (Second) of Torts § 343 (1965);

*Martino v. Great Atl. & Pac. Tea Co.*, 213 A.2d 608, 610 (Pa. 1965);

*Winkler v. Seven Springs Farm, Inc.*, 359 A.2d 440, 442 (Pa. Super. Ct.

1976), *aff'd without op.*, 384 A.2d 241 (Pa. 1978)).

16.     Plaintiff has failed to prove that Defendant was negligent.[33]  The evidence shows,

---

[33] We also note that the condition was so obvious and open that anyone with a normal perception, intelligence and judgment would have noticed it and protected herself accordingly.  A danger is deemed obvious if both the condition and the concomitant risk would be apparent to and would be recognized a reasonable man, in the invitee's position exercising "normal perception, intelligence and judgment."  *Montaperto v. Split Rock Resort*, 765 F. Supp. 852, 855 (M.D. Pa. 1991) (citing W. Prosser, Law of Torts § 61 (4th ed. 1971)), *aff'd without op.*, 958

at most, that on January 27, 2009, Plaintiff was on her way to CVS when Santoro

asked Plaintiff to mail a letter for her at the Southwark Post Office.  As Plaintiff

proceeded to the Post Office, Plaintiff tripped and fell on the Sidewalk.

17.     Plaintiff has failed to establish that she fell on January 27, 2009, as a result of a

dangerous condition that Defendant knew about or would have discovered if it

had exercised reasonable care.  Plaintiff has failed to prove by a preponderance of

the evidence that she fell as a result of a hole in the Sidewalk that was created by a

missing grate cover.  The only testimony that there was a dangerous condition on

Defendant's property as a result of a missing grate cover was Plaintiff's testimony.

Plaintiff's testimony concerning the happening of the Fall was not credible.

Plaintiff has presented three or four different versions of how the January 27 Fall

occurred.  The Claim Form that Plaintiff presented to Defendant states that

Plaintiff "was walking on [the] sidewalk located at 925 Dickenson[sic] Street,

Philadelphia, PA 19147-9998 when she tripped and fell over an elevation in the

sidewalk causing her to fracture her wrist."  (Tr. 53-56.)  On the day of her initial

visit to Dr. Yarus, Plaintiff told Dr. Yarus that she fell on the sidewalk on January

---

F.2d 364 (3d Cir. 1992).  Plaintiff testified that the hole in the ground of the Sidewalk was round
and approximately five inches wide.  (Tr. 45.)  Plaintiff testified that she did not see the hole.
She explained "[a]s I am walking, I look up, not down, Your Honor.  I don't know, ma'am.
When I walk, I look up.  I don't necessarily look down.  I don't want to get hurt as — if I'm
looking down, I'm going to bump into something, I walk and I look up.  I didn't see the hole, I'm
sorry."  (*Id.* at 115.)  There is no obligation to protect invitees from conditions whose danger is
so obvious and apparent that the invitee could reasonably be expected to take note of them and
protect herself against them.  *See Tarnoski*, 2007 WL 1387302, at *4 (finding that plaintiff failed
to prove the second element of the required duty of care since "the condition was so obvious and
open that anyone with normal perception, intelligence and judgment" would notice it).

27, 2009 "due to an elevation in the pavement." During her visits to the doctor, she told him that she hurt her left hand when she tripped on a curb and fell on the concrete sidewalk. (Yarus Dep. 14, 44-46.) In addition, Plaintiff's testimony with regard to the presence of ice or snow on the Sidewalk, and whether this might have contributed to the Fall, was inconsistent. These accounts of what caused this Fall are entirely different from the allegation that her foot went into a hole in the Sidewalk created by a missing grate cover. Plaintiff has provided no credible explanation for these discrepancies.[34] Moreover, there were multiple other inconsistencies in her testimony, many of which are reflected in the Findings of Facts.

18.     Furthermore, Plaintiff has failed to show that the hole that she alleges she tripped over or into actually existed on January 27, 2009. As noted above, we found the testimony of Carrozza credible. Carrozza's investigation into this matter — coupled with Defendant's compliance with the OSHA inspections, the daily inspections conducted by maintenance staff, Carrozza's review of the records kept in the ordinary course of the business (collectively, "Southwark Post Office's Procedures"), and the fact that no missing grate was ever reported — support the conclusion that no such defect existed on January 27, 2009. It is also significant that Plaintiff did not report this incident or the defective conditions to the Post Office on the day of the Fall, when she went back to take photographs or at any

---

[34] During each of Plaintiff's visits to Dr. Yarus, she stated that she hurt her left hand when she tripped on a curb and fell on a concrete sidewalk. (Yarus Dep. 44-46.)

other time until she filed a claim.  The law is clear that the mere happening of an

accident, in and of itself, is not evidence of a breach of the landowner's duty of

care to his invitees, nor does it raise a presumption of negligence.  *Moultrey*, 422

A.2d at 596 (citing *Amon v. Shemaka*, 214 A.2d 238, 239 (Pa. 1965); *Calhoun v.*

*Jersey Shore Hosp.*, 378 A.2d 1294, 1296 (Pa. Super. Ct. 1977); *Jones v. Sanitary*

*Mkt. Co.*, 137 A.2d 859, 860-61 (Pa. Super. Ct. 1958)).  We conclude that

Plaintiff has not established that a dangerous condition existed on Defendant's

property on January 27, 2009.

19.　　To prevail on a landowner negligence claim, such as this one, a plaintiff must

show that the business owner "deviated . . . from his duty of reasonable care under

the existing circumstances."  *Ryan v. Super Fresh Food Mkts., Inc.*, No. 99-1047,

2000 WL 537402, at *1 (E.D. Pa. Apr. 26, 2000).  Plaintiff's "case-in-chief must

consist of evidence which tends to prove either that **the proprietor knew, or in**

**the exercise of reasonable care ought to have known, of the existence of the**

**harm-causing condition**."  *Id.* at *1-2 (emphasis added) (citing *Moultrey*, 422

A.2d at 596).  "Where . . . the dangerous condition is transitory, a customer

ordinarily may satisfy this burden by proving either that defendant created the

condition or that the defendant had actual or constructive notice of the condition."

*Id.* at *2 (citing *Gorman v. Simon Brahm's Sons*, 148 A. 40, 40-41 (Pa. 1929);

*Moultrey*, 422 A.2d at 598).

20.　　There is no evidence in this case that establishes that the Southwark Post Office

knew or should have known that a missing grate cover, which allegedly created a

hole in the Sidewalk, existed.  The Southwark Post Office Procedures that were in place demonstrate that Defendant took reasonable measures to maintain the Southwark Post Office property, including the Sidewalk, in a safe condition for its invitees and its employees.  Any actual knowledge by the Post Office of a missing grate cover would have been reflected in the records.  There was no such record. Moreover, there is no evidence that the Southwark Post Office should have had constructive notice of the missing grate cover.  While Plaintiff's photographs — which were taken two to four weeks after the January 27 Fall — show what appears to be a hole in the Sidewalk, we are not satisfied, based upon the evidence, that this hole existed on Southwark Post Office property on January 27, 2009.  Neither Plaintiff nor Santoro nor anyone else having knowledge about the January 27 Fall reported it to the Southwark Post Office on that date.[35]  We conclude, after consideration of all of the evidence, that Plaintiff has failed to show that on January 27, 2009, Defendant breached its duty to Plaintiff.

21.     Plaintiff has failed to show, by a preponderance of the evidence, that Defendant was negligent and that Defendant's negligence resulted in injury to Plaintiff.[36]

---

[35] Carrozza testified that there are security cameras that cover the area where Plaintiff allegedly fell.  (Tr. 151.)  If Plaintiff, or anyone else, had reported the trip-and-fall in a timely manner, Defendant could have pulled up the security tape and reviewed what had actually occurred on January 27, 2009.  (*Id.* at 151-52.)  Carrozza did not pull the tape and review it because no one reported the fall within a month of the January 27 Fall.  The tapes are recorded over after a month.  (*Id.* at 152.)

[36] We have serious doubts that any injuries Plaintiff has sustained to date were the result of the January 27 Fall.  Plaintiff had several accidents, prior to the January 27 Fall.  In addition, Plaintiff's testimony, including her testimony concerning her injuries, was filled with inconsistencies.

Accordingly, we need not address the issue of her claimed damages.

For the foregoing reasons, judgment is entered in favor of Defendant.

An appropriate Order follows.

**BY THE COURT:**

_/s/ R. Barclay Surrick_
**U.S. District Judge**

35